The Assistant Vice-Chancellor.
The complainant on the 24th of Hay, 1839, was appointed the receiver of all the property and effects of George W. Bruen, in a suit prosecuted against him in this court by Joseph Cowperthwaite, as a judgment creditor who had exhausted his remedy at law. The bill of Cowperthwaite was filed, and the subpoena to answer served, on the 22d of December, 1838 ; upon which day, therefore, he acquired a lien upon G. W. Bruen’s equitable interests and things in action. An order for the appointment of a receiver was made on the 13th of March, 1839, and upon the complainant’s appointment in pursuance of the order, he became vested with those equitable interests and things in action, to the same extent and with the same rights that G. W. Bruen held and possessed them on the 22d of December preceding. The subsequent assignment executed by him to the receiver, transferred no additional or greater right to the latter. Its .effect was to vest in him the legal title ; the whole equitable interest being in him before.
The complainant in this suit claims, that G. W. Bruen, in December, 1838, was a creditor to a very large amount of the estate of his deceased partner, Thomas H. Smith ; that by means of a trust conveyance executed by Mr. Smith, in 1828, the defendant, Matthias Bruen, became possessed of all the real estate of Smith ; that the objects of the trust were accomplished within two or three years thereafter; but that M. Bruen contin *253 ued to retain the property, and by various contrivances, had placed a large portion of it in the hands of his sons, Alexander M. and Herman Bruen ; and that all three wrongfully claimed to own the parts of the property to which they had respectively acquired the legal title; whereas, in truth, it belonged to the estate of Smith, and ought to be applied by his personal representatives, heirs and devisees, to the payment of his debt to G. W. Bruen.
This plain and intelligible claim of the receiver, though simple in form, has involved the investigation and development of a long series of transactions, immense in their extent and the magnitude of the interests which they embraced, and requiring for their correct understanding, the application of a clear and vigorous intellect, and months of patient labor.
They have been so thoroughly unfolded by the receiver’s counsel, that my examination has been made comparatively free from difficulty.
In stating the outline of the case, I have omitted to mention some minor affairs, offshoots from the great trunk, which concern the defendant, Williams, and the children of Smith, independent of the success of the claim against the Bruen’s. These may require some notice in detail hereafter.
I. The great question in the cause, is presented by the complainant’s tenth point, in which he asserts, that it is clearly established by the testimony, that the liabilities of Matthias Bruen, as indorser and surety for Thomas H. Smith & Son, which were intended to be secured by the trust deed of July 8, 1828, and by the assignment of the ship Maria and her cargo, in October following, have all been paid out of the assets of the firm, and that the claim which M. Bruen sets up for his alleged payments on account of such liabilities, is false and fraudulent.
The trust deed conveyed to Matthias Bruen, absolutely and in fee simple, all of Mr. Smith’s lands, tenements and real estate, in the city of New York and in the county of Kings ; in trust, to sell the whole as he should deem proper, and while unsold, to lease and improve the same, and after paying the liens *254 thereon and the charges attending the trust, to apply the proceeds to the extinguishment of his liabilities for the firm of Thomas H. Smith & Son, and of such advances as he might make thereupon ; and to pay the surplus to Smith, his heirs, executors, administrators and assigns. The real estate thus conveyed, was very extensive and valuable, and was incumbered by mortgages to about $850.000, of which it will be necessary to speak more at large in another branch of the case.
Mr. Smith died in September, 1828, and G. W. Bruen on the 9th of October following, received letters testamentary, as his sole acting executor.
On the 16th of October, 1828, G. W. Bruen, as the surviving partner of Thomas H. Smith & Son, executed to his father Matthias Bruen, an assignment of the cargo of the ship Maria, then absent on a voyage to China, and belonging to the firm. The assignment recited M. Bruen’s liability as indorser of the notes of the firm set forth in a schedule annexed, and therein footed at $427,958 62, and professed to be made for the purpose of providing for their payment. It authorized M. Bruen to sell and dispose of the ship and cargo, to collect the insurance in case of a loss, and out of the proceeds, after paying charges and his reasonable commissions, to pay and discharge the notes mentioned in the schedule, and all notes given in renewal; and the overplus, if any, was to be paid to G. W. Bruen.
On the 28th of October, 1828, G. W. Bruen executed another assignment, of the ship Maria to M. Bruen, as a further security for any responsibilities which he might have incurred for Thomas H. Smith & Son. Besides the liabilities on notes set forth in the schedule attached 'to the first assignment of the cargo of the Maria, M. Bruen was at that time the surety of the firm, on their respondentia bonds, on the Maria, and on the ships Beaver, Citizen, and America, and their cargoes, to the amount of $172,000. In his answer, M. Bruen makes no claim in respect of these respondentia liabilities, with the single exception of a bond of $1500, which will be noticed elsewhere, and which is also specified in the schedule to the assignment;
I will therefore dismiss the subject of the respondentia bonds in general, as having no bearing upon the controversy.
*255 It is not alleged on the part of M. Bruen, that the schedule first referred to did not specify all his liabilities for Smith & Son, other than those bonds ; and the demands which in his answer he claims to have paid for that firm, are all contained in that schedule, with the exception of five under the dates of 1837 and 1838, to which I will advert particularly in another place.
The whole principal sum which the answer insists that M. Bruen paid as indorser for Thomas H. Smith & Son, is $367,066 57. If from this we deduct the five last items, together amounting to $74,826 45, there will remain only $292,240 12, of the liabilities enumerated in the Maria’s assignment, which M. Bruen claims to have paid himself.
"His answer is on oath, and directly responsive to the bill. It states unequivocally, that those liabilities and every part of them, were paid and discharged out of his own individual funds and resources. The complainant claims to have disproved this assertion in its whole length and breadth; and this is the first question to be examined.
It appears that G. W. Bruen, after the death of Mr. Smith, continued the name of the firm of Thomas H. Smith & Son in winding up their affairs, and kept a bank account in that name in the Bank of America. A bank account was also kept in the name of M. Bruen, in the Manhattan Company, commencing on the 27th of October, 1828. This account was under the control of G. W. Bruen, the bank pass book and check book were kept by him, and most of the checks were signed by him in the name of M. Bruen per procuration of G. W. Bruen. Occasionally a check was signed by M. Bruen himself.
From this period, through the six or seven succeeding years, G. W. Bruen used the name of his father to an unlimited extent, in all matters relating to the affairs and business of Thomas H. Smith & Son, and the estate of Thomas H. Smith; and also in an extensive mercantile business, commencing in or about the year 1830, and conducted in the name of M. Bruen. A general power of attorney, embracing every matter of business, executed by M. Bruen to G. W. Bruen, and dated December 19, 1833, is one of the documents proved. Into one or the other of these *256 bank accounts, passed all the proceeds of- the property of Thomas H. Smith & Son.
To return to the schedule annexed to the answer of M. Bruen, containing the debts which he says he paid for that firm. '
1. It is proved in the most conclusive manner, so as to overthrow entirely the force of the answer as testimony, that debts . in that schedule, amounting to $68,548 05, exclusive of interest, were paid by G. W. Bruen, in the name of Thomas H. Smith & Son, with the assets of that firm, by checks drawn on the. Bank of America; and that M. Bruen did not, even nominally, pay any portion of that sum.
2. It is also proved by testimony, which is equally satisfactory, that $102,439 20, exclusive of interest, of the debts in that schedule, were paid by checks drawn upon the Manhattan Bank account, in the name of M. Bruen, of which, $66,052 01 were paid prior to the arrival of the ship Maria, from Canton, which was on the 16th April, 1829, and the residue between that date and the 11th Jannary, 1830. Only one of the check’s by which these payments were made, was signed by M. Bruen; All the others were signed in his name by G. W. Bruen. The - whole $66,052 01 paid before the 16th of April, 1829, is traced directly to funds brought into that bank account from the assets of Thomas H. Smith & Son. In regard to the balance, $36,387 19 paid between that day and January, 1830, it may be observed in the first place, that there could have been no. deficiency of means during that time to meet those liabilities'; because it is proved that John Hone & Sons, on the 17th of Juné, 14th of July and 9th of November, 1829, advanced no less than $85,000, in cash and notes, to M. Bruen, upon the cargo of the Maria, exclusive of their payments of more than $70,000 on the • respondentia, in April preceding.
But without following the devolution of these advances, suffice it to say, that the testimony shows beyond all doubt, after giving full weight to the answer, that the whole 36,387 19, was paid out of the property of the firm of Smith & Son.
The entries in the checkbook, under the head of “M. Bruen, private' account,” when traced in detail, confirm most fully the testimony of the witnesses, and show that with the exception of *257 $573 10, all the funds credited to his account in the Manhattan Bank to the 14th April, 1829, were the property of Smith & Son, and that in fact it was their bank account.
And the circumstance that the small balance of that “ private account,” is carried into the next check book, with that designation, and is one of the charges against G. W. Bruen as surviving partner, in the schedule annexed to the further answer, in connection with the other evidence, abundantly proves, that the bank account continued through that check book to be one of the house of Smith &, Son, and of G. W. Bruen, in which M. Bruen had no individual interest.
3. Of the debts claimed to have been paid by M. Bruen, set forth in schedule A, to his answer, it is clearly proved that $47,000 were paid directly by John Hone <fc Sons, and were re-imbursed to them by the effects of Smith & Son.
4. In the same schedule are debts to the house of G. W. & H. Bruen, amounting to $32,788 82. There is no proof, except by the answer, that M. Bruen paid any part of this sum. Considering the utter demolition of the answer in respect of more than two-thirds of the payments set forth in that schedule, it would be entirely unsafe to rely upon its truth, as to the residue, when unsupported by testimony.
But there is strong evidence on the other side, that M. Bruen never paid any part of this indebtedness. In the first place, G. W. Bruen, the debtor, as the survivor of Smith & Son, was a creditor as one of G. W. & H. Bruen. In the next place, it is proved that the offices of these two houses, were adjoining, and in the same building, during these transactions; that besides the business account between the two houses, on which there was a balance against G. W. & H. Bruen in October, 1829, there was an account of cash borrowed and lent. That in the latter account on the 17th June, 1829, when the last of the notes to G. W. & H. Bruen set forth in the schedule fell due, that firm was indebted to Smith & Son in the sum of $26,626 01, and in October, 1829, the balance in favor of the latter firm in that account as entered, was about $35,000, and deducting a credit to G. W. & H. Bruen for payment supposed to have been made by them for Smith & Son in 1829, the balance against them in *258 the cash lent account, was $27,714 31. The presumption from' these facts is irresistible, that the notes in the schedule, due to G. W. <fc H. Bruen, all of which appear to have been issued for merchandise and debentures, were all discharged by Smith & Son, without the aid of M. Bruen.
5. Excluding the five last items in the schedule A, attached to M. Bruen’s answer, there remains the sum of $41,464 05, of the liabilities there enumerated, of which $24,000 were continuations of three notes to the Ocean Insurance Company, due in 1828, and $3000 was the balance of a note of $6000 to the American Insurance Company. The testimony is full and complete, proving that the whole $41,464 05, was paid out of the assets of Thomas H. Smith & Son. I include the proceeds of the Maria’s cargo in my statements as being assets of that firm ; and some portion of those proceeds, doubtless went to discharge the debts heretofore enumerated. All these payments, with the exception of $13,126 77, paid February 4th, 1831, on a renewed note to the Ocean Insurance Company, were made prior to 1831, and more than three-fourths of the whole were paid before 1830.
This disposes of the sum of $292,240 12, set forth in the schedule as having been paid by M. Bruen.
6. The five last items in that schedule, amounting to $74,826 45, remain to be considered. .The date of their alleged payment is of itself a strong argument against the propriety of the charge. I have already remarked that no such debts appear in the schedule attached to the assignment of the Maria, and the proof shows by the history given of each of the debts in that schedule, that neither of these five could have been brought down by renewal, from any of those provided for in that assignment. Tne largest debt of the five, ($33,202 93,) is entered in the schedule to the answer, as being due or as paid to the Bank of the State of New York, an institution which was not in existence till 1836. As to the debt of $20,245 to the United States Bank, it is evident no such debt existed in 1828.
The schedule to the Maria’s assignment, describes a debt of $30,000 to the Bank of the United States, and it is not credible *259 that a debt of $20,000 more to the same bank, would have been overlooked in making that assignment.
Then there is the testimony of William Roberts and Thomas M. Beare, which with the circumstances already mentioned, leaves no room for doubt, that M. Bruen was never liable for Smith & Son, in respect of either of the five debts in question ; and that in truth, neither of them ever were debts of Smith & Son, except the one entered as due to Couch. This was upon a note of Smith & Son to D. Stebbins, of whom Couch was the executor, dated April 2, 1828. Mr. Beare shows that the other four were debts of G. W. Bruen, which originated from 1835 to 1837„ Thus neither of the five last items in the schedule are in any manner connected with the trusts which M. Bruen assumed by the conveyance to him by Mr. Smith and the assignments of the Maria and her cargo in 1828.
And the extraordinary result of the whole inquiry is, that M. Bruen did not pay any sum whatever out of his own funds or resources, towards or in discharge of the debts and liabilities, for the security of which the real estate of Thomas H. Smith was conveyed to him in July, 1828. And that so far as that, the great object of the trust, was concerned, it had been fully accomplished as early as the 4th of February, 1831, and subject to his advances, (if any there were,) in respect of the real estate itself, the heirs aqd representatives of Mr. Smith, were at that time entitled to a re-conveyance of the whole property from M. Bruen.
II. This brings me to the next principal subject of controversy, the advances which M. Bruen claims to have made for improvements on the real estate so conveyed to him, and for taxes and assessments thereon, and in discharge of the mortgage debts with which it was incumbered.
In the further progress of the investigation, I shall no longer refer to the answer of M. Bruen, as testimony in the cause. In many instances, the contradictions of the answer to which I might refer, are established by irrefragable written evidence, and in others by two witnesses, or by one witness and circumstances. But the force of the answer as evidence, has been *260 already so irretrievably impeached, in respect of its most vital statements, that I am compelled to refuse to it any consideration as testimony in the defendants favor.
1. In schedule B. to the first answer, JVL Bruen charges to the trust estate $31,776 19, cash paid to F. Dibblee, for filling in the large tract conveyed to him, known as the Stuyvesant Association property. It is proved that the whole of this sum was paid to Dibblee out of the funds of Thomas H. Smith & Son, and no part of it out of M. Bruen’s resources. So far as checks were drawn for these disbursements, much the largest amount was by checks of Smith & Son on the Bank of America.
2. The same schedule contains a charge of $27,453 58 paid to Peter G. Stuyvesant, on a mortgage for $88,000 on the property last mentioned. All of this is shown to have been paid by G. W. Bruen, out of the funds of Thomas H. Smith & Son.
3. Next is a charge of $12,675 73, paid to the Globe Insurance Company, out of M. Bruen’s own funds, on the mortgages held by that company, in order to obtain a postponement of their foreclosure, on the 10th of April, 1830. The proof is that this money was paid by G. W. Bruen in M. Bruen’s name, out of the proceeds of the cargo of the Maria.
4. Three items of interest claimed to have been paid to Mr. Stuyvesant, viz. May 13 and November 15, 1830, in schedule B, to the first answer, and May 13th, 1831, in schedule A, to the further answer. All of these were paid by checks drawn by G. W. Bruen in his father’s name, on the. account in the Manhattan Bank before mentioned. As to the two first, the testimony leaves no doubt that the funds therefor were derived from the assets of Smith & Son. The general course of that bank account, till long after 1831, corroborates the irresistible presumption from the other transactions as to which the proof is positive, that the interest paid to Stuyvesant in November, 1831, came through the same channel, and was not paid out of M. Bruen’s own resources.
5. M. Bruen charges in his account as trustee under T. H. Smith’s deed of trust, for three notes made by him, one of $10,000, dated December 1, 1829, at six months, one of $12,500 at six months, and one of the same amount at .seven months *261 both dated January 1, 1830. The answer does not explain for what purpose these notes were issued, nor does it disclose any occasion for their use in respect of the real estate, so far as I can discover. This omission is of itself a strong circumstance against the charge, and as an item in a trust of real estate, ought perhaps to be deemed conclusive against it. The notes are not produced ; there is no proof of their payment; and the absence of any specification of their object, or of the person to whom they were given, precluded the complainant from making any direct proof on the subject. So far as negative testimony can go, it is shown by William Roberts, who was familiar with the affairs of Smith & Son, and with all the payments made for that house and for the estate of Smith prior to January 11th, 1830, that no such notes were made for any purpose connected with that estate. I am convinced that the whole charge is unfounded.
6. There remain in schedule B. to the answer, charges for expenses paid upon the real estate, amounting to $21,577 52, which are alleged to have been made in or subsequent to 1833.
If these were shown to be just charges against the lands, they are only material in an accounting between M. Bruen and the estate of Smith, in respect of his lien therefor, on restoring the trust estate ; and for the purposes of a decree in this cause, do not require my examination. With a single exception, all the items composing that sum, are proved to have been paid by G. W. Bruen, in the course of the business transacted by him under the name of “M. Bruen.” This disposes of the schedule B. annexed to the answer.
III. The next schedule, 0., is an account current of M. Bruen with G. W. Bruen, as executor and surviving partner, independent of the real estate. The remark just made, is applicable to this schedule. So much of it as is true, is appropriate to the master’s office, on adjusting the accounts under a decree.
The great mass of it has already been shown to be false. One forcible illustration of the manner in which these claims of M. Bruen’s are made up, is afforded by the charge of $22,567 55 for commissions, under date of March 10, 1831, which by refe *262 rence to the Treasury Report, cited in the schedule, appears to be a commission of five per cent, on the sale of the Maria’s cargo. In the credit side of the same schedule, he credits $192,432 66, for the net proceeds of that cargo ; and to arrive at that sum, as is shown by the same report, he had deducted from the gross sales, the identical commission thus charged a second time in the schedule.
This disposes of the principal subjects of discussion growing out of M. Bruen’s alleged advances for Smith & Son and the estate of Smith.
IY. I now approach a series of transactions, by which it is claimed that M. Bruen, in violation of his duty as trustee, suffered large portions of the trust estate standing in his name, to be sold upon various incumbrances, and became the purchaser of the same, in the name of his sons and other persons.
All these sales, with a single exception, occurred after the object of his trust had been effected, and at a time when the property belonged to the estate of Thomas H. Smith.
1. The sale under the foreclosure of the mortgages to the Globe Insurance Company, on the 17lh of March, 1831, at which M. Bruen became the purchaser of all the mortgaged premises, for $114,700. For the payment of this sum, he gave his bond and mortgage to the company for $95,000, and $19,700 was paid to the master. In truth, there was very little cash paid to the Insurance Company ; for out of this $19,700, there was returned to M. Bruen, or to G. W. Bruen using his name, $12,675 73, with interest from April, 1830, which the latter had then paid to the company out of the funds of Smith & Son, as has been stated heretofore.
Thus less than $6000 was actually required by the holders of these mortgages at the time of the sale; and considering the large amount of the property of Smith & Son, and the real estate of Smith, then in the hands of M. Bruen as trustee, and in the “ house of M. Bruen,” conducted by G. W. Bruen ; this sale as well as the others, which I shall be compelled to notice in this connection, appears to have been permitted without any necessity or good cause, and can only be accounted for on the *263 supposition that there was a settled determination to vest the whole estate of Smith, in M. Bruen and his younger sons, without consideration. Whether the design was at that time to defraud the government, then the mammoth creditor of the firm, or to overreach the heirs and devisees of Smith, is entirely immaterial. The actual payment made to the Globe Insurance Company, came from the “house of M. Bruen,” conducted by G. W. Bruen ; which house, in fact, was a continuation of Thomas H. Smith & Son, carried on with the remains of their property and that of Smith, in the name and under the cloak of M. Bruen.
A single proposition is sufficient to dispose of all the purchases now under consideration, which were made by M. Bruen, either directly or indirectly. As the trustee of the property, he could not become its purchaser. He had a duty to perform in regard to it, which was entirely inconsistent with his assuming that character. And no better illustration of the sound wisdom and morality of the rule which equity enforces on this subject, can be found, than is furnished in this very case, by the wanton and reckless sales of the lands of Thomas H. Smith, under the incumbrances with which they were charged when M. Bruen received them in trust. This rule has been asserted in several recent cases, and without dwelling upon if, I will refer to Van Epps v. Van Epps, 9 Paige, 238; Torrey v. The Bank of Orleans, 9 ibid. 649, affirmed in the Court for the Correction of Errors, in December, 1843 ;(a) Campbell v. Johnston, 1 Sandf. Ch. R. 148 ; Cram v. Mitchell, 1 ibid. 251; and Dickinson v. Codwise, ibid. 214.
It does not relieve the case from the presumption of wrong, that the sale was made under a judgment or decree. There may be instances of that kind, in which the court can see that no possible injustice has ensued, and thus be induced to permit a purchase by the trustee to stand. But there is nothing in this case to relieve the sales from the stern enforcement of the principle to which I have referred. In the instance immediately *264 under consideration, I must declare that the purchase by M. Bruen, was for- the benefit of the trust estate, and that he held the lands conveyed to him by the master, after such conveyance, precisely as he did before. •
2. The purchases' under the foreclosure of the Lafayette Insurance Company, were prior in time to that under the Globe mortgages, and I will next comment upon them. This sale was made early in 1830, and all the premises mortgaged, were on two different occasions, struck off to-Mr. Johá Ward, and con-v veyed to him by the master. He pmd<$24.000 on the purchase,' which was refunded to him by G. W-. Bruen, $19,000 of it at one time, out of the proceeds of the cargo of the Maria, in May, 1830. Mr. Ward was not present at the sales, but he permitted G. W. Bruen to bid in his name, with the express understanding, that he was to convey the property to M. Bruen, on his being repaid his advance. In point of fact, M. Bruen bid in his name at the first sale,-and G. W. Bruen at the re-sale of some of the lots, which were at first struck off to Denison. On the 3d of May, 1830, Mr. Ward quit-claimed these premises to M. Bruen. It is surely unnecessary to enlarge upon so plain a matter as this. The purchase must be deemed to have been made for the benefit of the trust estate.
3. Another and a greater fraud, was perpetrated in respect of the property designated as the Stuyvesant Association. This consisted of several hundred lots, on which M. Bruen made a false claim as heretofore detailed, in respect of the $30,000 and upwards, expended for filling in, &c., by F. Dibblee. And it has also been noted, that after the creation of the trust, more than $34,000 was paid in several sums to Mr. Stuyvesant, on the mortgage, out of the effects of Thomas H. Smith & Son; the last of which payments was made in November, 1831, when the interest was fully paid, the principal having been reduced to $66,000. It is evident that Mr. Stuyvesant was not very urgent for payment of his principal debt, from the fact that he received on the sale, the purchaser’s mortgages for $32.999 98 ; and the recklessness of the whole proceeding, is further illustrated by the large sum which M. Bruen received out of court as a surplus *265 on the sales, viz, $57,258 33 in the purchasers "mortgages, and $4960 in cash.
I may as well notice here, a most flagitious excuse, set up by M. Bruen in his answer, for his omission to prevent this sale on the foreclosure of Smith’s mortgage to Mr. Stuyvesant. He says that N. D. Elling.wood, Esq., filed a bill against G. W. Bruen and himself, and obtained an injunction “shortly after''' October, 1828, restraining him from selling any part of the real estate assigned to him fey Smith. Yet it is proved that Mr. Ellingwood’s suit was settled' on the 4th June, 1831, and the injunction, thereby terminated, was actually dissolved by a special order of the court on the 5th July, 1831.
The sale under the Stuyvesant mortgage, took place on the 20th September, 1832, and the whole property was bid off by George W. Bruen, in the name of Alexander M. Bruen, for $135,387 50.
Why the whole was sold, when by means of its previous division into lots and blocks, not much more than half of it need to have been sold to pay off the mortgage, is not explained, otherwise than by the fraudulent pretence set up by M. Bruen, that he had advanced of his own funds $34,000 and upwards to Mr. Stuyvesant, and $30,000 for filling and improving lots, which he was equitably entitled to have repaid to him, after satisfying Mi’. S. for his remaining debt.
By the terms of the sale, one-third of the purchase money was payable in cash, and this portion, $45,129 16,, .was paid. To effect the payment, G. W. Bruen obtained $45,000 in the name of M. Bruen, .from Prime, Ward & King on John Hone & Son’s acceptance. Their acceptance was made on the faith of the security of more than $80,000, then in their hands, the proceeds of teas imported by the “ house of M; Bruen,” and sold a few days before; and Ward & Co. paid the $45,000 to Prime, Ward & King, on the 9th of October, 1832, and were re-imbursed from the proceeds of the teas. For the residue of the'purchase money, A. M. Bruen executed his four mortgages to Mr. Stuyvesant for $32,999 98, and four other mortgages to the assistant register of this court, for $57,258 33.
On the 9th of February, 1833, very soon after the sale was *266 completed by the master, Alexander M. Bruen executed to George W. Bruen, a power of attorney, authorizing him to transact eyery kind of business for the constituent, including the sale and mortgaging of his lands; in short, a perfect carte blanche. And the result was, that G. W. Bruen, after the foreclosure, controlled and managed the property, in every respect as he did before the sale, and as if it were his own. The subsequent mortgages which were executed upon it, were executed by him in A. M. Bruen’s name. The great sale which was made to D. S. Dyson, was effected by him; and he executed the deed, in the name of’ his brother, A. M. Bruen.
At the time of this purchase, in the name of A. M. Bruen, he was a young man, a little more than twenty-one years of age, residing with and mainly dependent upon his father; and he had never had an opportunity to accumulate any property. The testimony proves, that he never paid any part of the consideration on the purchase, and all the facts combined, so far from proving that he is to be treated as a bona fide purchaser, without notice of his father’s violations of trust and of good faithj lead irresistibly to the conclusion, that he was the mere passive instrument in the hands of older men, to accomplish a stupendous scheme of fraud.
It would be a waste of time, for me to follow step by step, the proceedings in respect to this property, subsequent to the Stuyvesaut foreclosure. It is sufficient to say, that the title of A. M. Bruen, and that acquired subsequently by M. Bruen on the foreclosure of three of the mortgages which were transferred to him by the assistant register, must be deemed as held in trust for the heirs and representatives of' Mr. Smith. For such of the lands as they or either of them have mortgaged or conveyed to purchasers in good faith, they must respctively account, if the complainant shall prove to be entitled to the relief prayed in his bill, in respect of the issues still to be examined. And they will be allowed for all proper charges in their favor growing out of the management of the property, and the disbursements for taxes and assessments.
Some time in 1839, M. Bruen conveyed to his son Herman Bruen, one block of the Stuyvesant property, lying between 21st *267 and 22d Streets, the First Avenue and the East River. The consideration alleged, is certain heavy claims against M. Bruen, for services rendered to him by H. Bruen, on account of the assigned property, and for the benefit of the estate of Smith, and for which claims the conveyance was received by Herman in payment and satisfaction. No specific valuation was ever put upon these services, but they are represented as having extended through several years; and as having been accompanied by considerable disbursements, and that H. Bruen had received no compensation therefor. On the 14th of August, 1839, H. Bruen conveyed the entire block to the New York Gas Light Company, and M. Bruen received the consideration, $40,000, exclusive of the arrears of water rent due on the premises. The answer states, that in consequence of M. Bruen’s receiving this price, he conveyed to H. Bruen subsequently, the next block north of the one so sold, and also a gore of land on 14th Street.
It is gravely asserted in the answer, that these conveyances were made in good faith, for a valuable consideration, which was more than the value of the lands. This claim does not require a moment's consideration. The answer itself does not pretend that H. Bruen was a purchaser without notice of the rights and equities of Smith’s estate; and if it had made that essential averment, the consideration alleged was a precedent debt, of so indeterminate a character, that the defendants have not as yet been able to approximate to its amount. The ready facility with which H. Bruen surrendered to his father, the parcel first conveyed, shows that he was but a nominal owner, and there is no reason to doubt that he held the two other parcels on the same tenure.
One other circumstance in this affair, deserves to be noticed. The three Bruen’s state that the $40,000 received from the Gas Light Company, was applied to the extinguishment of certain liabilities of M. Bruen, by way of indorsement, incurred on account of the firm of Thomas H. Smith &. Son. This, be it remembered, was in the latter part of 1839, and its utter recklessness is absolutely painful, when I reflect that all of those liabilities of M. Bruen, were discharged more than eight years before. *268 The title of H. Bruen, must therefore be adjudged to be subject to the same equities, as if it had continued in the name of his father.
This ends the examination of the various allegations and pretences, under which the property in question is claimed by M. Bruen and his two sons, in hostility to the estate of Thomas H. Smith. 1 have not deemed it necessary to go into all the details of those claims, or to comment upon those portions of the trust estate conveyed to M. Bruen, which still remain in his name, or which he conveyed directly to others, without the intervention of foreclosures and sham purchases in the names of himself and his friends. These matters will be proper subjects for the master’s office, if the cause proceed to a reference and an account.
Y. Before leaving this branch of the case, I will advert to the allowances claimed in behalf of M. Bruen, in any accounting concerning the premises. Some of these have been noticed incidentally. As to the commissions for his indorsements and credit, used by Smith & Son, such a claim is inconsistent with his character as an accommodation indorser, in which he appears in the trust deed; and there is no allegation of any undertaking by Smith & Son to pay any such commissions.
A compensation is claimed, both as between him and the firm, and between him and Smith’s estate, for “ his extraordinary services and exertions,” in behalf of both. So far as-M. Bruen’s very extraordinary proceedings have been conducted in behalf of either, and not in his own behalf exclusively, he is entitled to a liberal compensation. The care, liability and exertions inci-' dent to such an immense property as was placed in his hands in 1828, unquestionably call for an ample remuneration. There is no doubt that in the great operation, which alone was the causé' of the surplus property now in dispute, the settlement with the Treasury Department of the vast debt due to the United States, M. Bruen rendered to the firm of Smith <fc Son, and the estate of Smith, services which can scarcely be estimated by a pecuniary scale. It may be said that these services were not intended in any degree for the benefit of either the firm or the estate. *269 However that may be, if they enured to the benefit of Smith’s estate, they are entitled to a full remuneration.
The troubles, embarrassments and expenses, growing out of the possession of the Maria and her cargo, together with the commissions stipulated in the assignment, are also just subjects for compensation in an account. And the same remark may be made of services and disbursements in general, made and rendered by M. Bruen, in conducting the trusts.
Another claim is made, which is not so clear, and that is for the demands due to him from G. W. Bruen individually. Those are not the subjects of set off, in any accounting to which this suit can lead. If the complainant succeed in his suit, it will pave the way for all creditors of G. W. Bruen to come in for the payment of their debts, and these defendants will then have an opportunity to prosecute their claims against him.
The demand in favor of M. Bruen on the judgments recovered by the United States, against Smith & Son, or G. W. Bruen, as surviving partner and as executor, cannot be sustained for any portion of those judgments. The principal consideration paid for the compromise of the government debt, was the $200,000 paid by D. S. Dyson for the lands heretofore mentioned, as being conveyed to him by G. W. Bruen, in the name of A. M. Bruen. That entire fund was the property of the estate of Thomas H. Smith. It may be safely assumed that the only real and substantial consideration for the compromise, so far as the views and actions of the government were concerned, consisted of the cash paid, and the debenture certificates given up.
Besides the money paid, M. Bruen set forth sundry claims against the government, which he proposed to yield up, which he alleges were cancelled in the adjustment, and for which he now demands compensation. These were, 1st, damages on the teas imported in the Maria, occasioned by the delay in their sale, growing out of the interference of the government officers, stated at $50,312 90. 2d. The like damages on silks, $13,955 60; with interest on both items. If any such damages were incurred, they were borne by Smith & Son, and not by M. Bruen. This is also true of the items of depreciation on the ship Maria, *270 and the price of the ship Beaver, specified in M. Bmen’s letter of July 6th, 1830, to the Solicitor of the Treasury. And as to the Beaver, I have no evidence that he ever had any interest in the vessel. Two other items in that letter, one for discounts and extra commissions, and the other for a bond paid to the government by M. Bruen, may also be set aside in considering the affair as between him and the firm of Smith & Son, and Smith’s estate.
3rd. The charges for storage and insurance, if paid by M. Bruen, will be proper items in the accounting in this suit.
4th. The loss of commercial credit, is stated at $75,000, and is predicated on the same interference of the government with the Maria and her cargo. According to M. Bruen’s answer, he had long before that period, retired from commercial pursuits. He was no longer a merchant. He had no occasion for commercial credit, and the whole charge must be regarded, as I doubt not the Treasury Department regarded it, as mere moonshine. So far as this case discloses, if any losses or sacrifices occurred by reason of the seizure of the Maria and cargo, to the standing of M. Bruen as a monied man, in the estimation of those holding the commercial paper of Smith & Son, or of those applied to for loans on his credit, they must have been borne by Smith & Son.
5th. The debenture certificates were a legitimate demand against the United States, and they belonged in part to T. H. Smith & Son, and in part to G. W. & H. Bruen. It is possible that the latter were the same debentures, which to the amount of nearly f 19,000, formed a part of the indebtedness of the firm of Smith & Son to G. W. & H. Bruen, heretofore discussed, which was outstanding when it stopped payment. But assuming that they still belonged to G. W. & H. Bruen, when they were cancelled, the fact does not entitle M. Bruen to claim for them. They are either to be treated as compensated by the judgments of the United States against G. W. & H. Bruen, which were discharged by the compromise, or as a matter of account to be adjusted between H. Bruen and G. W. Bruen, or between the former, and Smith & Son.
This disposes of all that need be said, about the consideration *271 for the compromise with the United States. The assignment of the judgments, was not authorized by the act of congress ; and it being obtained with assets belonging to those for whom M. Bruen was trustee, it is as to them, in every sense, brutum fulmén.
What I have said, is an answer to one of the complainant’s points, to the effect that Smith & Son are entitled in equity to claim the United States judgments against H. Bruen, and their proceeds, if any, received by M. Bruen. There is no evidence of any such proceeds, and I regard the judgments, on the proof before me, as extinguished, except to the extent that may be necessary to do equity between the parties, as to the consideration actually paid and applied.
VI. It being established that there is a large property belonging to the heirs, devisees and legal representatives of Thomas H. Smith, in the hands of M. Bruen, and his two sons, Herman and Alexander, (including that for which M. Bruen is justly accountable ;) the next step in the complainant’s progress, is to prove that G. W. Bruen was a creditor of the estate of Smith, in December, 1838.
The testimony clearly establishes, that at the termination of the partnership by the death of Mr. Smith, he stood as a debtor to the firm, on its books, in more than $850,000. I cannot understand the co partnership articles, as compelling G. W. Bruen to assume with Mr. Smith, all the mercantile debts of the latter. The entries in the books show that there was no such understanding between the partners ; and if the articles require that construction, then the books establish a different agreement made subsequently. G. W. Bruen’s debt to the concern, at its dissolution, was $10,000. On a settlement at that time, between the latter, and his co-partner, he would have been a creditor of Mr. Smith to the extent of one-half of the $840,000, being the difference between their respective balances. In the profits made prior to 1828, his interest was but one-third, and this would perhaps slightly dimmish his share of this balance.
The house of Smith & Son, during its brief continuance, was eminently prosperous; but their whole profits will not ac *272 count for more than a quarter of this extraordinary indebtedness of the senior partner. It is, however, fully explained by the testimony. Pursuant to the co-partnership agreement, Smith <fc Son, through their firm, were to discharge all the outstanding engagements of Mr. Smith, and they were paid within a year and a half, to the enormous amount of more than two millions of dollars. This was accomplished, in a great measure, by the credit which the firm received from the United States, on their bonds for the duties payable on teas and other China goods imported by them. The goods met with a ready sale at auction ; notes were given for the proceeds, which were available as cash ; and thus the whole amount of duties became a capital in the hands of the firm, obtained on a credit from the government, which remained outstanding till the bonds became payable. And while the amount of their importations continued regular and uniform, the extent of the fund thus obtained on credit and used by the firm, would remain about the same, and in the nature of a permanent loan.
In effecting the result under consideration, there was no mere substitution of the obligations of the new house for those of the old. The latter were actually paid and discharged. All the means which Mr. Smith brought into- the new concern, were applied, as far as they would go, in liquidation of his outstanding liabilities, and in addition to those assets, more than $800,000 of the funds of the firm, were used for the same purpose. It does not affect the argument, that those funds were obtained on a credit. They were obtained on G. WJBruen’s individual and primary responsibility, as well as on that of T. H. Smith ; and the doctrine of principal and surety has no application. If G. W. Bruen had possessed his father’s large estate, every dollar of it would have been subjected to the payment of the debts incurred, out of which Mr. Smith’s liabilities were discharged. The circumstance that he brought no capital into the concern, therefore, has no influence on the point. In truth, neither of the partners brought actual capital with them. What Smith possessed in personal property was far short of his debts. The residue of his mercantile obligations, was paid by the assets of the *273 new house, and by moneys raised on its credit. It was the credit of both partners and the money of both.
The idea that at the dissolution, Smith’s estate was primarily liable for a part of the debts of Smith & Son, as substituted securities or obligations for those of Smith, is fanciful and impracticable. His old liabilities could not be traced into the existing debts. Suppose his executor had at that time attempted to select a portion of those debts, as being or representing Smith’s old liabilities ? Which of the existing debts could he have designated and thus classified, and on what principle or data could he have proceeded ? Let us leave out of view for a moment, that Smith had any real estate, and suppose what is probably true, that much of the commercial credit of the house, (aside from the government credit,) was founded on M. Bruen’s indorsements. And suppose further, that six or seven years after the failure of Smith & Son, M. Bruen, moved by regard for his son, had loaned G. W. Bruen $200,000, with which he had compromised a million of the debts of the firm, and thereby left in its hands a half a million of property. Could G. W. Bruen in that case, say to the children of his deceased partner, ‘ this was my money which discharged these debts. You have no interest in the matter. You did nothing towards producing this surplus which you now claim, and it is all mine. I will repay my father his advance, and am then worth $300,000.’
Now would not such an argument, be just as valid in the mouth of G. W. Bruen, in the case supposed, as is the argument here, that he has no interest in the surplus produced by the advantageous compromise with the government?
The position assumed, really is no more nor less than this, that because the misfortunes and bankruptcy of the house were owing to the enormous debt with which T. H. Smith overwhelmed it from his old business, and whereby the large profits made by the new house were wholly swallowed up; therefore the entire benefit of the compromise of the debts of the new house, must enure to T. H. Smith. In one sense, the compromise may well be regarded as the proper effect of the old debts of Smith ; if the old debts had not existed, there would have been no com *274 promise; and it may be added, nor any occasion for one. But there is no justice or propriety, in holding that Smith's estate shall have all the benefit of the compromise of the debts of the firm, on the ground that a portion of those debts arose from the discharge of his own liabilities.
The principles applicable to the point, are plain and equitable. Whatever remains after the payment of the debts of the firm and its capital stock, is a surplus to be divided between the partners. It is immaterial how the debts arose, if they are co-partnership debts when paid, or whether they were paid in full or compromised. If either partner apply his individual funds to the compromise of a debt, he becomes a creditor of the firm, for the amount paid, but not for the amount of the debt. He cannot make a profit out of his co-partner, by buying up the liabilities of the firm.
In this case there was no capital stock. There was a surplus after the payment and discharge of the debts, which surplus was represented by Thomas H. Smith’s debt to the firm. The principal liability was extinguished by funds furnished from the estate of Smith. For those funds, as well as all others which his individual property may have turned in to pay the debts of the firm, his estate is to be credited towards the liquidation of the balance due from him to the firm at his death.
It is evident from the facts before me, that in the accounting thus ordered, there will be a very large sum remaining due from Smith’s estate to the late co-partnership, of which G. W. Bruen’s one-half will far exceed the debt due from him to Mr. Cowperthwaite, which the complainant as receiver more immediately represents.
VIL I will now notice some objections to the complainant’s suit, interposed by M. Bruen, and his sons, Herman and Alexander.
1. It is said that if G. W. Bruen were such creditor of T. H. Smith’s estate, as is alleged, these defendants, if accountable at all, can be made to account only to the legal representatives of Smith, in a suit properly instituted for that purpose. Also that the complainant should first have obtained a decree against *275 G. W. Bruen, and then proceeded upon that decree against Smith’s assets.
I think that the complainant’s proceeding is right, in the form which this suit has assumed. As the receiver of G. W. Bruen’s effects, in the creditor’s suit adverse to him, the complainant stands in the shoes of G. W. Bruen, to enforce his demand against the estate of Smith. Finding the same G. W. Bruen to be sole executor of his debtor T. H. Smith, and the trustee of his real estate, and finding also that the father and brothers of G. W. Bruen, were in possession of a great part of Smith’s effects, claiming them as their own; it was necessary, in order to reach those effects, to bring the suit against the Bruen’s, as well as against Smith’s legal representative, heirs and devisees.
The latter were necessary parties for two reasons. First, as the devisees under the will of Smith, they were the debtors to G. W. Bruen, and so to the receiver, although a part of the assets in respect of which they were liable for the debt as such devisees, was wrongfully withheld from them by the other three defendants. And second, as to the assets which they received from M. Bruen on their settlement with him, both he and his sons as well as those devisees, were necessary parties, in order to enable the court to determine out of which set of assets, equity requires this debt of Smith to G. W. Bruen to be enforced in the first instance. For it is manifest that the devisees of Smith would endeavor to turn the complainant, first against the effects of Smith, still retained by the Bruens; while the latter would insist that the property in the hands of the devisees, should be first exhausted for the payment of the complainant’s claim. The case of Fellows v. Fellows, 4 Cowen, 682, is a sufficient authority for the form of the suit in this respect.
An objection on the part of G. W. Bruen and the devisees of Smith, is so intimately connected with the one just discus-ed, that I will examine it in this place. It is in effect, that the complainant, as a creditor of T. H. Smith, through G. W. Bruen, cannot unite the executor and the devisees of Smith in the same suit; and that he cannot maintain any suit against either the executor or the devisees, except in compliance with the mode pointed out by the statutes.
*276 As to this, it cannot he contended for a moment, that any proceeding before the Surrogate’s Court could have been moulded to do justice between these parties. The alleged frauds of M. Bruen, and the claims against H. and A. M. Bruen, could not have been entertained, in any proceeding of which that court had jurisdiction. Then, as to the statute regulating suits against heirs and devisees. (2 R. S. 452, 455, § 32, 33, 56, 57.) This suit, considered as one against devisees in respect of real estate devised to them, is in conformity to its provisions. The proof is ample, that the personal assets of Thomas H. Smith were not sufficient to pay or discharge this debt, or any portion of it deserving to be mentioned. . His interest in the personal effects of Smith & Son, went into G. W. Bruen’s hands as surviving partner, and all those effects fell far short of paying the debts for which they were primarily liable. G. W. Bruen, as such survivor, is of course accountable for their proper application, and for such as he misapplied, he is responsible to those entitled to the property of Smith under his will. Then as to the heirs, there was no real estate which descended to Mr. Smith’s heirs as such. And the suit is one against his devisees, to recover a debt out of the equitable real estate to which they were entitled under his will.
I need not determine whether the real estate assigned by T. H. Smith to M. Bruen, is to be considered as converted into personalty from the time of the assignment. It will be difficult to maintain that there was an equitable conversion, upon a trust which did not require the lands to be sold at all events, and when the result did not require a sale of any considerable portion of them. But assuming that there was a conversion, and that G. W. Bruen as executor, was entitled to receive and apply the proceeds in pursuance of Mr. Smith’s will; the complainant could not proceed, without bringing before the court the heirs and devisees of Smith. The executor, in that capacity, and in his capacities as surviving partner, as the husband of one of the devisees and legatees, and as the debtor whose assets have been wrenched from him and vested in a receiver; represents so many conflicting interests, and stands in so many relations inconsistent with each other’s claims, that no court co.uld, in justice to the *277 interests which he represents as trustee, adjudicate upon them without the presence of his beneficiaries.
Therefore, if the bill had been framed against him as executor, and merely to enforce the debt of Smith against his personal estate, G. W. Bruen’s interest as partner and as a creditor of Smith, is so hostile to that of the legatees and devisees, for whom he stands as executor, that the latter would be held entitled to be heard on the questions involved. And thus, regarding the property in question as personal assets, they are made parties as beneficiaries in a trust, because of the adverse interest of their trustee in the matter in controversy. (See Dias v. Bouchaud, 10 Paige, 446.) I have examined the point as if all the devisees of T. H. Smith were entitled to raise it at the hearing. In truth, the only one who has the shadow of a claim to urge it, is John Smith Bruen, and his stipulation is probably a waiver of the objection.
2. It is claimed by M. Bruen, that a purchase by a trustee is not void, and that is voidable only at the volition of the beneficiary, whose right to avoid it does not pass by involuntary assignment, and cannot be enforced in favor of a creditor. Without adverting to the fraudulent character of these transactions, I cannot assent to the proposition that the right to avoid a trustee’s purchase of the trust estate, is personal to the beneficiary. It undoubtedly passes to his heirs or legal representatives, as the case may be; and it is a right in action to which creditors may become entitled, as certainly as they may to a promissory note.
The cases of pledgees, mortgagees and judgment creditors, purchasing at sales made by virtue of their securities, which were cited, are not analogous. Those creditors stand in no relation of trust or confidence to the debtor; and not only may buy, but are often compelled to buy at such sales, in order to avoid loss. In one case cited, Wilson v. Troup, 2 Cowen, 238, the language of the judge, to the effect, that no one but the cestui que trust has a right to question or set aside a purchase made by his trustee, was addressed to the particular facts of that case, in which the objection was made, not by the beneficiary or any one in privity, but by the person whose mortgage to the trustee *278 had been foreclosed, and who was in no sense a privy to or interested in the affairs of the trust.
3. The acquiescence of G. W. B;ruen, the executor, in M. Bruen’s proceedings, is another argument of the defendants. As to this, so long as there was no change in the management of the property, and G. W. Bruen retained its entire control, there could be no acquiescence, in the sense claimed. Whenever M. Bruen avowed his intention to hold the property for his own benefit, and set his beneficiaries at defiance; their subsequent silence might, in time, prevent their questioning his acts. But that is not this case; and I need not decide how far G. W. Bruen, in his peculiar position, could yield a valid assent to these proceedings.
4. As to the releases executed by the executor, heirs and devisees of T. H. Smith, to M. Bruen, in March and April, 1839, they cannot affect the complainant’s demand, either as evidence of acquiescence, or in their direct operation. One difficulty which precludes them from having either of those effects, is that the right which the complainant is enforcing against G. W. Bruen, had in December preceding, become a lien upon the debt due to him from Smith’s estate; and any act done by those entitled to Smith’s estate, in derogation of creditors, would be void as against them. But there is another answer to this. It now appears that M. Bruen was at that time a mere naked trustee, without any interest in the remaining real estate, or a particle of right to retain it from Smith’s children. His compromise under such circumstances, which was in effect, obtaining from his beneficiaries a part of the trust estate without any real consideration, conferred upon him no just claim to divert the complainant’s debt from that portion of Smith’s property, which he thereby retained, and to cast it upon the property which he then gave up to his beneficiaries. The court in determining out of what fund the complainant’s claim shall be paid, is compelled so far to look into the equities of the defendants as between themselves, as to adjudge for the purposes of this suit, that M. Bruen acquired no title by those releases which can interrupt the complainant’s remedy against the property remaining in his hands. There is nothing in the idea, that in those settlements, M. Bruen *279 was süch a bona fide purchaser without notice, as to release him. from the effect of the lis pendens of Cowperth waite’s bill against G. W. Bruen. The case as to A. M. Bruen, who stands merely for M. Bruen, is upon the same footing as that of the latter, in respect of the settlement and releases.
5. What I have heretofore said, disposes of the point, that M. Bruen, as trustee for T. H. Smith, may set off in favor of Smith’s estate, against G. W. Bruen, the latter’s portion of the judgments against the firm, which the United States assigned to M. Bruen. The judgments were extinguished ; Smith’s estate is entitled to be credited for the sum which it furnished to discharge 'them ; and M. Bruen has no interest in the judgments or their application.
As to the marital rights of G. W. Bruen in the estate of T. H. Smith, I am persuaded that it is quite unnecessary for me to determine them in this suit. The testimony indicates distinctly, that the debt due from that estate to G. W. Bruen, will more than suffice for the purpose of the receivership. The whole estate of Smith being liable for that debt, there is no property on which the marital right can operate until the debt is paid.
As to the defendant, R. S. Williams, the property which he holds, stands on the same footing as that which has been vested in the heirs of Mr. Smith, by the conveyances of M. Bruen. It is all subject to the debt due to G. W. Bruen, if the property in M. Bruen’s hands and for which he is accountable, with that held by H. and A. M. Bruen, is insufficient to discharge that debt.
There must be a decree in accordance with these principles, with a reference to a master to take the necessary accounts. An account must be taken of the co-partnership dealings between Thomas H. Smith and G. W. Bruen, which will be continued between the latter and the estate of Smith, till the 22d of December, 1838, so as to ascertain the balance which was due at that time, from the estate of T. H. Smith to G. W. Bruen. Also an account of G. W. Bruen’s administration as executor of the estate of Smith, including his acts as trustee of the real estate.
An account must be taken of the transactions of Matthias Bruen, in respect of the real estate of Thomas H. Smith, under the trust deed of July 8,1828. The principles applicable to that *280 accounting, both as to charges and allowances, have been sufficiently pointed out. The lands which M. Bruen conveyed to Smith’s executor ahd devisees, are to be stated in the account, but they will be excepted from the balance against him. And the master will state whether M. Bruen is still liable for any and what debts, for which the trust deed was intended as a security.
There must also be an account stated between M. Bruen ahd the firm of Thomas H. Smith & Son, in respect of the ship Maria and her cargo, and of the other property and effects of that firm, which Came to the hands of M. Bruen, if any there were; with the like inquiry as to the outstanding liabilities of M. Bruen, which were intended to be secured by the assignment of the Maria and her cargo.
An account is to be taken between Alexander M. Bruen and the estate of Smith, in respect of the rents of the real estate which he purchased and claimed, and his disbursements, if any, on account of the same. And a like account between the estate of Smith and Herman Bruen.
In the accounting between G. W. Bruen and the estate of Smith, in respect of the co-partnership, the estate is to be credited towards the debt of Smith to the firm, with the proceeds of his real estate, which were applied to the discharge of the debts due by the firm whether the same, were applied by M. Bruen or G. W. Bruen; and the $200,000 paid on the compromise with the United States, will be credited to Smith’s estate accordingly.
The master will ascertain and report, what property of the firm of Thomas H. Smith & Son, is in the hands of the respective defendants, including such as they ought to account for; and what property of the estate of Smith is in the hands of his executor, or of M. Bruen, H. Bruen and A. M. Bruen respectively, or for which they are accountable; and also what debts and liabilities of T. H. Smith &. Son, and of T. H. Smith, are still outstanding and payable.
At the option of the complainant, an account may be stated between Herman Bruen and the firm of T. H. Smith & Son, in respect of the dealings of the firm with G. W. and H. Bruen, and with H. Bruen; in which account, the latter will be charged *281 With the sums paid and allowed to the government, on the compromise of the judgments against him and his firm, in proportion to the whole amount paid and allowed on the whole compromise, and will be credited with the amount of his debenture certificates, and those of his firm, applied in the compromise. The account will also embrace all other dealings between the two firms; and on the balance being struck, H. Bruen will be charged or credited the one half part of such balance, as the case may be. If the balance prove to be against G. W. & H. Bruen, G. W. Bruen’s half part of it will be a charge against him in the accounting of Smith & Son, as between him and T. H. Smith.
The decree will contain the proper declarations, in "respect of the various issues made by the pleadings and adjudged by the court, with the usual directions. An injunction must issue against G. W. Bruen, as executor, and against M. Bruen, H. Bruen and A. M. Bruen, restraining them from disposing of or meddling with the remaining property and effects of T. H. Smith, and those of T. H. Smith & Son ; and there must be a receiver of the same appointed, to whom those defendants will execute the requisite transfers.
All further questions and directions will be reserved, with liberty to all parties to apply, &c. In consequence of the death of M. Bruen, soon after the hearing, the decree will be entered as of the seventeenth day of June last.

 The affirmance is reported in 7 Hill, 260. And see Dobson v. Racey, 3 Sand Ch. R. 60; Moore v. Moore, ante, page 37.